Joseph COSENTINO and Anthony Magana, Petitioners,

v.

Walter KELLY, Superintendent of Attica Correctional Facility, and Daniel Senkowski, Superintendent of Clinton Correctional Facility, Respondents.

No. 95 Civ. 3388 (WCC).

United States District Court, S.D. New York.

May 10, 1996.

Rochman Platzer Fallick & Sternheim, New York City, for Petitioners; Barry M. Fallick, of Counsel.

Jeanine Pirro, District Attorney of Westchester County, White Plains, NY, for Respondents; Julianne Burrell Newman, Joseph M. Latino, Asst. District Attorneys, of Counsel.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Joseph Cosentino and Anthony Magana have filed this petition for a writ of *habeas corpus,* pursuant to 28 U.S.C. § 2254 *et seq.* Petitioners request a writ of *habeas corpus* on the ground that their Sixth Amendment right to a public trial was violated. Having raised this issue in their state court proceedings, petitioners have exhausted available state remedies. For the reasons discussed below, the petition is denied.

## BACKGROUND

Petitioners Anthony Magana and Joseph Cosentino each were charged with the crimes of murder in the second degree, criminal use of a firearm in the first degree (two counts), criminal possession of a weapon in the second degree (two counts), and criminal possession of a weapon in the third degree (three counts). Both indictments charged that petitioners aided, abetted, and acted in concert with one another to accomplish the murder of John Petrucelli in White Plains, New York on September 13, 1989.[1]

The first jury trial in this matter commenced on October 10, 1990 before the Honorable Donald Silverman, County Court, Westchester County. The jury completed deliberations on October 31, 1990, and informed the court that it had reached a verdict. Prior to bringing the jury into the courtroom, the court cautioned spectators to maintain control of themselves when the verdict was read. After the jury entered the courtroom, the court asked the jury what verdict it had reached with respect to the first count charging petitioner Magana with murder in the second degree. The jury foreperson responded, "Guilty, your Honor." At this point, a major disruption ensued involving family members and friends of petitioners, and certain spectators had to be removed from the courtroom. The jury foreperson then announced guilty verdicts for the remaining counts which were submitted for their consideration. The court then ordered a recess, and a court officer removed everyone from the courtroom.

1. Petitioners' indictments were subsequently ordered consolidated for purposes of trial.

2. This portion of the record reads in full as follows:

THE COURT: Let me just state for the record that which is not already on the record and that is that at the time that the verdict was announced there were a great many members of the defendants' family, friends here, I say 10 to 15 and not all of them but a good many of them just went absolutely off the wall yelling and screaming, several had to be physically restrained, taken out of the courtroom, we had quite a scene here.

The jury later re-entered the courtroom, at which time the court expressed its apologies for the earlier disruption. When the jury was polled, two of the jurors changed their verdicts, and a third juror was unsure. Another juror addressed the court stating, "The jury has completely fallen apart at this particular time, judge, because of what happened in this courtroom just now and that— none of us, I think, can right now give anything a fair answer of any kind. I'm sorry." Trial Transcript, at 1724–1725 (Oct. 31, 1990).

After the jury was excused, both defense attorneys moved for a mistrial. The court stated, on the record, the essence of the disruption that had just occurred in the courtroom. Specifically, the court stated that "at the time the verdict was announced there was a great many members of the [petitioners'] family, friends here, I say 10 to 15 and not all of them but a good many of them just went absolutely off the wall yelling and screaming, several had to be physically restrained, taken out of the courtroom, we had quite a scene here...." Trial Transcript, at 1725–1726 (Oct. 31, 1990).[2] The matter was then adjourned to the following morning.

The following morning, both defense attorneys renewed their motions for a mistrial, which were denied. A curative instruction was given to the jury, but, after several more hours of deliberations and several readbacks, the jury sent a note to the court advising it that they were unable to reach a unanimous verdict. Both defense attorneys again moved for a mistrial, and their motions were granted by the court.

As I indicated to the jury, one unlike any that I've ever seen or the attorneys have ever seen, as they indicated to me. And we had, I'd say, at least half a dozen or so court officers here and there were not enough for—we had to send the jury back into the jury room, we had to get the defendants out of the courtroom and we had to do what we could, the court officers had to do what they could to get the disruptive people off the floor and they eventually accomplished doing that. But the scene played out in front of the jury was a terrible one and their state of—I guess you'd have to say emotional distress at this point in time is certainly understandable to this court....

Trial Transcript, at 1725–1726 (Oct. 31, 1990).

On January 11, 1991, during a scheduled calendar call, the court informed the parties that petitioners' wives and petitioner Cosentino's son would be barred from the courtroom during the second trial due to their involvement in the courtroom disruption which occurred during the first trial in this matter. Transcript of Calendar Call Before Hon. Donald Silverman, at 5–7 (Jan. 11, 1991). Petitioners moved, pursuant to Article 78 of the Civil Practice Law and Rules, for an order prohibiting retrial of the matter on double jeopardy grounds; an order reversing the trial court's order barring four[3] family members from the courtroom during the re-trial of this matter; and to obtain certain discovery materials prepared by federal authorities. Petitioners' motion was denied.

After a second consolidated jury trial, petitioners each were convicted of the crimes of murder in the second degree and criminal possession of a weapon in the third degree (two counts). Pursuant to these convictions, on May 31, 1991, petitioners were sentenced to concurrent terms of imprisonment of twenty-five years to life for the crime of murder in the second degree and two and one-third to seven years for the crimes of criminal possession of a weapon in the third degree (two counts).

Notices of appeal were filed and the appeal was perfected.[4] On appeal, petitioners argued that (1) the trial court's closure of the proceedings to their families deprived them of their constitutional right to a public trial; (2) the trial court improperly failed to make reasonable inquiry of each juror about petitioner Cosentino's involvement with organized crime; (3) the trial court should have ordered the Westchester County District Attorney to turn over to defense counsel all discovery materials prepared by federal authorities; and (4) petitioner Cosentino was denied a fair trial by the prejudicial statements in the prosecutor's summation. The

judgments of the conviction were affirmed by decision and orders of the Appellate Division. *People v. Magana,* 198 A.D.2d 306, 603 N.Y.S.2d 772 (1993); *People v. Cosentino,* 198 A.D.2d 294, 603 N.Y.S.2d 560 (1993). Petitioners sought leave to appeal to the New York Court of Appeals. Petitioners' applications were denied. *People v. Cosentino,* 83 N.Y.2d 909, 614 N.Y.S.2d 391, 637 N.E.2d 282 (1994); *People v. Magana,* 82 N.Y.2d 927, 610 N.Y.S.2d 179, 632 N.E.2d 489 (1994). Petitioners then filed the instant application for *habeas corpus,* and this Court directed respondents to answer by November 27, 1995.

## DISCUSSION

The Sixth Amendment, as applied to the states through the Fourteenth Amendment, guarantees that a criminal defendant shall enjoy the right to a "public trial." U.S. Const. amend. VI; *In re Oliver,* 333 U.S. 257, 266, 68 S.Ct. 499, 504, 92 L.Ed. 682 (1948). This right assures the public that the defendant is dealt with fairly, protects against prosecutorial and judicial misconduct, encourages witnesses to come forward and discourages perjury. *Waller v. Georgia,* 467 U.S. 39, 46, 104 S.Ct. 2210, 2215, 81 L.Ed.2d 31 (1984). It may also cause all trial participants to perform their duties more conscientiously and gives the public an opportunity to observe the judicial system. *Gannett Co. v. DePasquale,* 443 U.S. 368, 383, 99 S.Ct. 2898, 2907, 61 L.Ed.2d 608 (1979). The exclusion of courtroom observers, especially a defendant's family members and friends, even from part of a criminal trial, is not a step to be taken lightly. *Guzman v. Scully,* 80 F.3d 772, 776–77, (2d Cir.1996). Moreover, it is well-settled that a defendant whose right to a public trial has been violated need not show that he suffered any prejudice, and the doctrine of harmless error does not apply. *Waller,* 467 U.S. at 49–50 & n. 9, 104 S.Ct. at 2217 & n. 9; *Guzman,* 80 F.3d at 776–77;

---

3. The trial judge stated that petitioners' wives and Cosentino's "son" would be barred from the second trial. However, portions of the record indicate that Cosentino's *two sons* may have been barred from the second trial. We do not deem this discrepancy significant to the issues raised in this petition.

4. By Decision and Order dated March 10, 1992, the Supreme Court, Appellate Division, Second Department granted petitioners' motion to consolidate their state appeals.

*Vidal v. Williams,* 31 F.3d 67, 69 (2d Cir. 1994), *cert. denied,* ⸺ U.S. ⸺, 115 S.Ct. 778, 130 L.Ed.2d 672 (1995); *Ip v. Henderson,* 710 F.Supp. 915, 919 (S.D.N.Y.), *aff'd mem.,* 888 F.2d 1376 (2d Cir.1989).

The right to a public trial is not absolute, however, and in some instances must yield to other interests, such as those essential to the administration of justice. *Waller,* 467 U.S. at 45, 104 S.Ct. at 2214–15. In *Waller,* the Supreme Court identified four requirements that must be met before public access to a criminal proceeding may be denied: "[1] [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceedings, and [4] it must make findings adequate to support the closure." *Waller,* 467 U.S. at 48, 104 S.Ct. at 2216; *see Vidal,* 31 F.3d at 69; *Woods v. Kuhlmann,* 977 F.2d 74, 76 (2d Cir.1992). Where a court orders only partial closure, rather than complete closure, the first requirement—an "overriding interest" in favor of closure—is somewhat relaxed. In those situations, a "substantial reason," rather than an "overriding interest," satisfies the first criterion because "a partial closure does not implicate the same secrecy and fairness concerns that a total closure does." *Woods,* 977 F.2d at 76; *see United States v. Doe,* 63 F.3d 121, 129 (2d Cir.1995).

## I. Substantial Reason

Petitioners do not seriously dispute that prevention of a mistrial in a criminal case constitutes a "substantial reason" to order a partial closure. "The right to a public trial 'has always been interpreted as being subject to the trial judge's power to keep order in the courtroom. Were this not so a public trial might mean no trial at all at the option of the defendant and his sympathizers.'" *United States v. Hernandez,* 608 F.2d 741, 747 (9th Cir.1979) (quoting *United States ex rel. Orlando v. Fay,* 350 F.2d 967, 971 (2d Cir.1965), *cert. denied,* 384 U.S. 1008, 86 S.Ct. 1961, 16 L.Ed.2d 1021 (1966)). *See United States v. Akers,* 542 F.2d 770, 772

(9th Cir.1976) (closure appropriate to avoid disorder), *cert. denied sub nom. Wallace v. United States,* 430 U.S. 908, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977); *Fay,* 350 F.2d at 971 (closure appropriate to maintain order in the courtroom). Indeed, "[w]hen the trial judge has reason to believe that any persons or any groups of spectators are disorderly and may continue to do so he may exclude individuals or groups as the occasion requires." *Fay,* 350 F.2d at 971.

## II. Narrowly Tailored

We turn to whether the partial closure was narrowly tailored to exclude spectators only to the degree necessary to satisfy the objective for which it was ordered. At a calendar call on January 11, 1991, the trial court discussed its decision to order a partial closing of the second trial as follows:

THE COURT: [N]ow, as a result of the disturbance that we had in court last time, it is my intention to bar from the courtroom the wives of the defendants and the son of the defendant Cosentino, and I think you gentleman [sic] can understand why.

I think if we eliminate them, most of the others that were present didn't cause a sufficient amount of disturbance that I would bar them, but those particular individuals did and they will be barred from the courtroom.

MR. CARROZZA [for Cosentino]: May I be heard as it impacts my client? Of course I strenuously object to that and I do admit quite candidly there was a disturbance at the time of the verdict, but there was no difficulties [sic] whatsoever even in this crowded courtroom throughout the trial, so I think the actions taken by your Honor . . . are most respectfully somewhat excessive and I submit that it deprives my defendant of the solace of having his family in the courtroom when he is on trial. That is the whole idea of a public trial.

THE COURT: Yes, they have a right to be here unless they do something to forfeit that right and they did that in this particular case and the record of what occurred at that time speaks for itself, so I don't think I have to restate everything that was said

at that point in time, but the disturbance was a very very bad one.

Even in your own extensive experience I am sure you have seen very few disturbances which would approach that one.

I was kind enough that I didn't hold them in contempt, of course, because I think I understood the emotion, the genuine emotion that they felt at that time, but they also exhibited an inability to control their emotions and what was done in this court was inexcusable and I won't allow the opportunity for it to happen again. MR. RICHMAN [for Magana]: In no way to offend this Court, I will ask you to allow the people there. I take strong exception to the review that a defendant's family should not be present when he is faced with a mandatory minimum of fifteen to life on this particular case should he be convicted.

THE COURT: One of the reasons I wanted this calendared now was to advise you of the Court's intention at this time, and if you want to bring motions you can bring them.

Transcript of Calendar Call Before Hon. Donald Silverman, at 5–8 (Jan. 11, 1991).

Petitioners maintain that the trial judge issued too broad a closure by excluding the petitioners' family members from the entirety of the second trial, rather than excluding them from only the announcement of the verdict. It is impossible to say with certainty whether a more narrow closure—such as one in which some family members were excluded only during the announcement of the verdict as petitioners suggest—would have been sufficient. Based on the disturbance that occurred in the first trial, we conclude that the trial judge's order struck an appropriate balance between the interest in conducting an orderly trial and petitioners' interest in being afforded a "public trial."

Petitioners argue that the court should have allowed all the family members to re-main throughout the second trial, relying on an admonition by the court that outbursts will not be tolerated. However, the family members had demonstrated once already that an admonition from the court was no assurance that chaos would not break out in the courtroom. The mistrial in the first case resulted in a substantial waste of the parties' and the court's limited resources. There was no way to predict when defendants' family members might cause another disruption; lacking knowledge as to when another disturbance would erupt again, the trial court was not required to limit its exclusion of family members to that portion of the second trial where the disruption in the first trial occurred.

Also, the record reflects that only some of the family members who were involved in the disruption were excluded.[5] The trial judge excluded only those members who were most responsible for the disruption, and no others. This served the added purpose of deterring any future disruption on the part of those who were allowed to remain despite their involvement in the disruption of the first trial. The purposes of the Sixth Amendment right to a public trial, enunciated in *Waller,* 467 U.S. at 46, 104 S.Ct. at 2215 (to let the public see that defendant is dealt with fairly; to protect against prosecutorial and judicial misconduct; to encourage witnesses to come forward; and to discourage perjury), have been adequately served in the challenged trial in this matter. There was no secrecy of the nature which the Sixth Amendment was intended to prevent. *See In re Oliver,* 333 U.S. at 270–71, 68 S.Ct. at 506–07. The transcript of the second trial became a public record, and those who were barred from the second trial were free to communicate with friends and family members who were not excluded.

### III. Investigate Alternatives

Petitioners argue that *Guzman* stands for the proposition that, prior to imposing clo-

5. The record indicates that 10 to 15 members of petitioners' families and friends "went absolutely off the wall." Since the trial judge barred only three members—Cosentino's wife, Magana's wife, and Cosentino's son—it must mean that other family members and friends who were involved in the disruption were nonetheless permitted to attend the second trial. We conclude from these facts that the trial judge struck an appropriate balance between competing interests.

sure, a court must make a finding that alternatives to a "blanket prohibition" would be inadequate to insure a fair trial before an impartial jury. At the trial of defendant in *Guzman*, just prior to the cross-examination of a prosecution witness, the State requested that the trial court exclude four women, who the State asserted were friends or family members of another witness, from the courtroom during the cross-examination. The State claimed that their presence in the courtroom was intimidating to the prosecution witness. Defense counsel represented to the court that two of the four women were related to this other witness, but the other two women were "not so related but are either familially or socially related to [the defendant]." *Guzman*, 80 F.3d at 774. The trial court then, without conducting any further inquiry, immediately granted the prosecution's request, stating the following by way of justification: "In order to facilitate the [prosecution] witness's being able to testify without interference, without fear, without concern which apparently he has communicated, I will then exclude the [four women] only during the testimony of that witness." *Id.* Thus, with only a brief statement of its reasons, the trial court partially closed its courtroom to these four women. *Id.* The Second Circuit found this reasoning insufficient in the face of defendant's constitutional challenge:

> The trial court based its decision solely upon representations made by the prosecutor that [the prosecution witness] felt intimidated by the presence of these four women in the courtroom. The trial court, however, did not inquire of the witness whether he in fact felt intimidated nor whether his fear, if genuinely held, was sufficiently well-founded to constitute an "overriding interest" within the meaning of *Waller*, or at least a "substantial interest" within the meaning of *Woods*. Indeed, the trial court made no inquiry whatsoever. Although this Circuit has not required that a separate hearing must always be held before the courtroom doors may be closed, separate hearing must always be held before the courtroom doors may be closed, the lack of such a hearing is relevant to the lawfulness of any closure. . . .

> Even more disturbing is the fact that when defense counsel pointed out that two of the women were not related to [the other witness], as the prosecution had alleged, but were instead related to the defendant, the trial court still did not make any inquiry to ascertain the relevant facts. If that inquiry had confirmed defense counsel's assertion that two of the women were part of [defendant's] family or at least his friends, then the trial court would have been obliged to give significant weight to this circumstance in determining whether closure was warranted.

*Id.* at 775. The court went on to say that the trial court's partial closure of its courtroom violated the defendant's right to a public trial, primarily because "the trial court relied on the unsubstantiated statements of the prosecutor, rather than conducting an inquiry of the prosecution witness on whose behalf the closure request was made." *Id.* at 775. Furthermore, the court held that "[w]ith the interest in favor of closure merely alleged but not established, there could be no compliance with the second requirement that the closure be 'no broader than necessary to protect' the interest." *Id.* "The third requirement of considering alternatives to closure was not even attempted to be met. Since there was no issue of concealing the witness's identity from the four women but only a claim of intimidation by their presence, seating them at the rear of the courtroom might well have sufficed to allay whatever legitimate anxiety, if any, the witness may have apprehended." *Id.* Finally, the trial court's conclusory justification for excluding the four women failed to satisfy the fourth requirement of "findings adequate to support the closure." *Id.*

■ Relying on *Guzman*, petitioners argue that there is no indication in the record that the court explored any alternatives or considered imposing any less broad proscription. We disagree. It should be noted that *Waller*'s third requirement—that the trial court investigate alternatives to its closure order—is not a high hurdle to overcome. For example, in *Woods*, 977 F.2d at 77, the trial court asked the witness if it was true that she was reluctant to testify because of

certain fears that she had for the safety of herself and her family; the witness responded "yes," and the trial court informed her that the courtroom had been cleared of the defendant's family members. The Second Circuit held that this brief inquiry investigating possible alternatives to the partial closure order was sufficient. *Id.* In *Guzman,* the Second Circuit found that the trial court had failed even to seek alternatives, and distinguished *Woods* based on the brief investigation that the trial court in *Woods* conducted. *Guzman,* 80 F.3d at 775–77.

The instant case is distinguishable from *Guzman.* Essentially, the entire closure request in *Guzman* was based on speculation. *See Guzman,* 80 F.3d at 775–76. In the instant case, the trial court's decision was based on the actual events of the first trial, where, upon announcement of the jury's guilty verdict, bedlam broke out in the courtroom among petitioners' family members and friends, and some of them had to be restrained physically and removed from the courtroom. This disruption took place after the trial court had admonished all spectators against precisely such misconduct. The disruption directly affected the jury to the extent that some of them changed their previously reported verdicts of guilty. Thus, unlike the *Guzman* case, the trial court here had a substantial basis for its partial closure ruling in the second trial. Moreover, the trial court only barred those few family members that were most responsible for the disruption in the first trial. On this record, it cannot be said that the trial court acted based on speculation or without regard for the rights of the accused. Surely, the trial court should not have had to risk a second mistrial, caused by a few spectators who had demonstrated a disregard for the court's directives.

Petitioners reiterate that the judge should have considered excluding the family members only during the reporting of the verdicts. The record does not indicate whether the trial court considered this more limited exclusion. However, given that one disruption had occurred already after the announcement of the verdict in the first trial, it was not unreasonable for the trial court to conclude that it was necessary to exclude the instigating family members during the entirety of the second trial, as a disruption at any point of the second trial could have led to a second mistrial. The partial closure that was ordered was one of the less restrictive alternatives available to the court. It excluded only those few family members who were most responsible for instigating the disturbance in the first trial, as opposed to excluding all ten to fifteen family members and friends who were involved in the disruption.

## IV. Findings to Support Closure

■ The Supreme Court's final requirement is that the trial court make findings adequate to support the closure. The purpose of this requirement is to allow a "reviewing court [to] determine whether the closure order was properly entered." *Waller,* 467 U.S. at 45, 104 S.Ct. at 2214–15 (quoting *Press–Enterprise Co. v. Superior Court of California,* 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984)). The trial judge in the instant case made a point of describing for the record the disturbance that erupted in the first trial. Furthermore, the trial judge discussed with the attorneys his decision to order partial closure, and stated for the record why he was ordering partial closure. After a thorough review of the record, we conclude that the trial court made findings adequate to support the partial closure of petitioners' second trial.

### CONCLUSION

For the foregoing reasons, the petition for a writ of *habeas corpus* is denied.

SO ORDERED.