

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00339-CR

———————————————

HENRY RODRIGUEZ, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 362nd District Court
Denton County, Texas
Trial Court No. F16-930-362

---

Before Pittman, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

**MEMORANDUM OPINION**

## I. Introduction

A jury convicted Rodriguez of continuous sexual abuse of a child. The trial court assessed his punishment at forty-eight years' incarceration in the Texas Department of Criminal Justice.

Rodriguez raises two issues on appeal. First, he claims that the trial court deprived him of a public trial by excluding from the courtroom several individuals who had disrupted the trial. We conclude that the trial court acted properly and that its findings adequately document why it took the action that it did.

Second, Rodriguez claims that the trial court erred by admitting evidence that impeached his testimony on a collateral matter. Even if the matter were collateral to the merits, Rodriguez opened the door to being impeached by lying gratuitously on direct examination.

We overrule the two issues raised by Rodriguez and affirm the judgment of the trial court.[1]

---

[1]Because Rodriguez does not challenge the sufficiency of the evidence, we omit a factual background.

## II. Issue No. 1—Rodriguez claims that the trial court deprived him of a public trial.

### A. The trial court dealt with a disruption by Rodriquez's supporters in the gallery by excluding them from the courtroom.

The trial court had to deal with the fraught environment of a courtroom in which the child sexual-abuse Complainant and her family and Rodriguez's family and his supporters were present. The emotions of that setting presented the trial court with a number of challenges. At points during the trial, Rodriguez's supporters made gestures that distracted the jury and the trial court. The bailiff admonished an individual who was making gestures and enlisted Rodriguez's counsel's help in admonishing Rodriguez's family and friends to behave appropriately. The trial court was compelled to admonish Rodriguez's mother in open court after she had continued to disrupt the trial.

The trial continued, and the jury found Rodriguez guilty. He then elected to have the trial court assess punishment. The jury was excused, and a recess was taken. At this point, according to the trial court's findings, the following occurred:

> The victim and her mother remained on one side of the courtroom while the defendant's friends and family remained on the other side of the courtroom. A few members of the defendant's friends and family turned and made threats and derogatory statements to the victim and her mother. My bailiff immediately walked between the two groups to keep them separated. He then instructed the two to four people that were making the threats and derogatory statements that they had to leave the courtroom. At least three or four friends and family of the defendant, including the defendant's mother, remained in the courtroom for the remainder of the trial.

3

When the recess ended, the trial court clarified that it was excluding only those who were "making the disruption and making the derogatory comments to the child victim." The members of Rodriguez's family who were not disruptive were permitted to remain in the courtroom. Neither the courtroom nor any proceeding was closed to the public at large. The trial court took its action to prevent further distractions, to protect Complainant and her family from threats and derogatory remarks, and to maintain order. The trial court took the step of excluding disruptive individuals from the courtroom only after its admonitions and those it enlisted Rodriguez's counsel to make had failed.

**B. Standard of review for a claimed deprivation of the right to a public trial**

The Texas Court of Criminal Appeals has detailed the standard that we must apply to a question of whether a trial court acted properly in closing a defendant's trial:

> [A]s a general rule, the appellate courts, including this Court, should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact finding[s] are based on an evaluation of credibility and demeanor. The appellate courts, including this Court, should afford the same amount of deference to trial courts' rulings on "applications of law to fact questions," also known as "mixed questions of law and fact," if the ultimate resolution of those questions turns on an evaluation of credibility and demeanor. The appellate courts may review [de novo] "mixed questions of law and fact" not falling within this category.

*Cameron v. State*, 490 S.W.3d 57, 69–70 (Tex. Crim. App. 2016) (op. on reh'g) (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).

4

## C. Applicable Law

### 1. The right to a public trial is a fundamental constitutional protection.

The court of criminal appeals succinctly described the source of the right to a public trial, the harm that results from the deprivation of that right, and the purposes that a public trial serve as follows:

> The Sixth Amendment of the United States Constitution guarantees an accused the right to a public trial in all criminal prosecutions. And the Supreme Court has held that the violation of a criminal defendant's Sixth Amendment right to a public trial is structural error that does not require a showing of harm. Moreover, the Court has held that the right to a public trial was created for the benefit of the accused; thus, the right is a personal one. The public-trial guarantee benefits the accused by acting as "an effective restraint on possible abuse of judicial power." It has also been found that "judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings."

*Lilly v. State*, 365 S.W.3d 321, 328 (Tex. Crim. App. 2012) (citations omitted).

### 2. The standard for rebutting the presumption that a trial should be conducted openly

"The right to a public trial is not absolute and may be outweighed by other competing rights or interests, such as interests in security, preventing disclosure of non-public information, or ensuring that a defendant receives a fair trial." *Id.* It is, however, a rare occasion that warrants depriving a defendant of his right to a public trial, and the United States Supreme Court has established the general standards that must be met to overcome the presumption that a trial should be open:

5

[(1)] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [(2)] the closure must be no broader than necessary to protect that interest, [(3)] the trial court must consider reasonable alternatives to closing the proceeding, and [(4)] it must make findings adequate to support the closure.

*Id.* at 329 (citing and quoting *Waller v. Georgia*, 467 U.S. 39, 48, 104 S. Ct. 2210, 2216 (1984)).

### D. Analysis

**1. Rodriguez bears the burden of proof to show that his trial was closed to the public, but the record conclusively establishes that it was partially closed.**

The logical first question to the claim that the defendant was deprived of a public trial is whether the trial was actually closed. A defendant bears the burden of proof to establish that a trial was closed to the public. *Cameron*, 490 S.W.3d at 68. Here, there is no question that the exclusion of certain spectators closed Rodriguez's trial. Even the exclusion of only a limited number of people constitutes a partial closure of the courtroom that may violate a defendant's right to a public trial. *Woods v. State*, 383 S.W.3d 775, 781 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd); *see also Turner v. State*, 413 S.W.3d 442, 449 (Tex. App.—Fort Worth 2012, no pet.) ("The exclusion of even a single person from court proceedings can violate a person's Sixth Amendment right to a public trial.") (citing *Presley v. Georgia*, 558 U.S. 209, 212, 130 S. Ct. 721, 723 (2010)).

6

## 2. The trial court's findings adequately describe why the trial court partially closed Rodriguez's trial.

We will follow the analytical path adopted by the Texas Court of Criminal Appeals and first examine the fourth of the four factors that determine if a trial was properly closed—whether the trial court entered findings that adequately explain its actions. *See Lilly*, 365 S.W.3d at 329. The findings are the lynchpin of the analysis. *See id.*

The findings must be on the record and must be specific. *Id.* Generic findings are insufficient because they lack the detail that we as a reviewing court need to determine "whether the closure order was properly entered." *Id.* (citing *Presley*, 558 U.S. at 215, 130 S. Ct. at 725). "Proper findings will identify the overriding interest and how that interest would be prejudiced, why the closure was no broader than necessary to protect that interest, and why no reasonable alternatives to closing the proceeding existed." *Id.*; *Turner*, 413 S.W.3d at 449–50 (holding that trial court's findings were inadequate because "nothing in the record shows that the trial court's ruling met the requirements of *Waller*" when "the trial court did not state an overriding interest other than space concerns, did not consider reasonable alternatives that might have accommodated appellant's family members, and did not make

adequate findings to support its decision to exclude appellant's family members" (footnote omitted)).[2]

We attach the findings entered by the trial court as an appendix to this opinion.[3] These findings contain the required level of detail. We will explain below why the findings demonstrate that the trial court properly excluded a limited number of disruptive individuals from Rodriguez's trial.

### 3. The trial court's findings establish substantial reasons for the trial court's actions.

A partial closure that results from excluding particular individuals—and not the entire public—from the courtroom appears to lower the hurdle that a trial court must clear to justify the closure, with the standard falling from an overriding or compelling reason to a substantial reason. *See Woods*, 383 S.W.3d at 782. The rationale for the lesser standard is that "partial closures do not raise the same constitutional concerns as total closures because an audience remains to ensure the fairness of the proceedings and [to] preserve the safeguards of public trials." *Id.*; *see also Cameron*, 490 S.W.3d at 68 ("Some courts have applied a less stringent test for 'partial' or 'trivial'

---

[2]The trial court stated on the record its reasons for excluding individuals from the trial. After this appeal was perfected, the State filed a motion to abate the appeal to give the trial court an opportunity to enter more specific findings. We granted the abatement. The additional findings were filed in a supplemental clerk's record.

[3]We have redacted the findings, as well as the portions of the record attached to the findings as exhibits, to remove the name of the disruptive member of the gallery.

closures[] where members of the public are temporarily excluded from the courtroom. These courts require only a 'substantial' or 'important' interest rather than *Waller*'s 'compelling' reason for limiting access in order to justify a closure, in part because a less-than-complete closure does not 'implicate the same secrecy and fairness concerns that a total closure does.'" (citation omitted) (quoting *Garcia v. Bertsch*, 470 F.3d 748, 753 (8th Cir. 2006))); *see also United States v. Cervantes*, 706 F.3d 603, 611–12 (5th Cir. 2013) ("Partial closure of a courtroom during a criminal proceeding is a constitutional question reviewed de novo, and the Court will affirm so long as the lower court had a 'substantial reason' for partially closing a proceeding.") (citing *United States v. Osborne*, 68 F.3d 94, 98–99 (5th Cir. 1995)).

The trial court's power to control the orderliness of trial proceedings is unquestionably a substantial reason for a partial closure. At the most elementary level, a trial judge has the power to keep order in his courtroom, lest the very purpose of a trial be jeopardized:

> "The right to a public trial 'has always been interpreted as being subject to the trial judge's power to keep order in the courtroom. Were this not so a public trial might mean no trial at all at the option of the defendant and his sympathizers.'"

*Cosentino v. Kelly*, 926 F. Supp. 391, 393 (S.D.N.Y. 1996) (quoting *United States v. Hernandez*, 608 F.2d 741, 747 (9th Cir. 1979)).[4]

---

[4]Because Rodriguez's first issue involves the constitutional right to a public trial, we include citations to relevant federal cases.

Various matters impacting the conduct of a trial justify the exclusion of specified individuals from the courtroom, such as protecting the jury from improper influences, protecting a witness from retaliation or emotional harm, and preserving order in the courtroom. *Cameron*, 490 S.W.3d at 68 ("For example, . . . courts have held that partial closures are permissible to exclude certain spectators when it is deemed necessary to preserve order in the courtroom.") (citing *Cosentino v. Kelly*, 102 F.3d 71, 73 (2d Cir. 1996)); *see also* Tex. Code Jud. Conduct, Canon 3B(3), reprinted in Tex. Gov't Code Ann., tit. 2, subtit. G, app. B ("A judge shall require order and decorum in proceedings before the judge."); *Woods*, 383 S.W.3d at 782 ("Each of those circuit courts [the Second Circuit, the Fifth Circuit, the Eighth Circuit, the Ninth Circuit, the 10th Circuit, and the Eleventh Circuit] held that the need to protect a witness from retaliation or emotional harm justified temporarily excluding a specific person or group from the courtroom during that witness's testimony."); *Johnson v. State*, 137 S.W.3d 777, 779 (Tex. App.—Waco 2004, pet. ref'd) (holding that the trial court was acting to preserve an overriding interest to protect the jury from improper influences when the trial court excluded the defendant's aunt from the courtroom after her actions had already threatened to improperly influence the jury).

Here, the trial court's findings invoke all three of these reasons for its actions:

The exclusion was necessary to conduct [a] fair trial for the defendant wherein the jury could concentrate on the evidence presented. Throughout the trial, several jurors had complained that the behavior of certain members of the defendant's family and friends [was] distracting them from the testimony. Additionally, the exclusion was necessary to

protect the child victim and her family from threats and derogatory comments. The bailiff had to step in to . . . remove the two to four people that continued making threats and derogatory comments. Finally, the exclusion was necessary to maintain order for a criminal jury trial.

This finding demonstrates that the trial court had abundant substantial reasons to exclude disruptive spectators from the trial.

### 4. The trial court's actions were narrowly tailored to address the reasons why it was compelled to partially close the trial.

The trial court's actions targeted only those who were disrupting the proceedings:

The only people [who] were excluded from the courtroom were the two to four individuals [who] were causing the disruption by making threats and derogatory comments to the victim and her mother. All other members of the public previously listed, including the defendant's mother and other family and friends[,] remained in the courtroom.

Rodriguez offers no explanation of how the trial court could have more narrowly tailored its actions, and we can think of none. *See Cosentino*, 926 F. Supp. at 396 (holding that trial court narrowly tailored its actions by excluding only those whom it had admonished for disruptive behavior but who had failed to heed the admonition).

### 5. The trial court sensibly considered and rejected alternatives to the action of excluding from the courtroom those who were disrupting the trial.

Because of the importance of affording a defendant an open trial, the trial court's findings must demonstrate that the trial court actually considered reasonable alternatives before even partially closing the trial. *Lilly*, 365 S.W.3d at 329 ("Proper

findings will identify . . . why no reasonable alternatives to closing the proceeding existed.") (citing *Presley*, 558 U.S. at 215–16, 130 S. Ct. at 725). The standard requires that the trial court have a basis to "sensibly reject" the alternatives available to it. *Steadman v. State*, 360 S.W.3d 499, 509 (Tex. Crim. App. 2012) ("That a trial court can reasonably discount *some* alternatives, however, does not insulate it from *Presley*'s mandate that it be able to sensibly reject '*all* reasonable alternatives' before it can exclude the public from voir dire proceedings." (quoting *Presley*, 558 U.S. at 216, 130 S. Ct. at 725)); *Harrison v. State*, No. 02-10-00432-CR, 2012 WL 1034918, at *12 (Tex. App.—Fort Worth Mar. 29, 2012, no pet.) (per curiam) (mem. op., not designated for publication) ("Even if the trial court had sufficiently documented facts to reasonably discount Harrison's first proffered alternative to closure, this did 'not insulate it from *Presley*'s mandate that it be able to sensibly reject ["]all reasonable alternatives["] before it [could] exclude the public from voir dire proceedings.'" (quoting *Steadman*, 360 S.W.3d at 509)).

The trial court's findings document the alternative steps that the trial court took before excluding the disruptive individuals from the courtroom:

> The court had previously used less restrictive means by admonishing these individuals several times about their inappropriate behavior. Unfortunately, these less restrictive measures were not sufficient to stop them from distracting the jury and disrupting the proceedings. Therefore, excluding only these specific individuals from the courtroom was necessary and the least restrictive means to proceed with an orderly trial.

Thus, the trial court gave the disruptive individuals an alternative to the possibility of exclusion—to reasonably comport themselves while in the courtroom. And the trial court limited the exclusion to only those individuals who had refused to follow this alternative. *See Cosentino*, 926 F. Supp. at 398 (holding that trial court adequately considered alternative to exclusion of spectators when trial court admonished gallery not to disrupt proceeding, disruption occurred in spite of admonition, and trial court excluded from second trial only those who had created the disruption).

The findings also demonstrate that the trial court considered the extreme step of holding in contempt those who were disrupting the trial: "It's very rare that I exclude anyone from the courtroom, but the other option is to have them . . . held in contempt and put them in jail, in which, once again, they would not be in the courtroom anyway."

In the face of these findings, Rodriguez attacks the trial court for not being thorough enough in its consideration of alternatives.[5] Rodriguez criticized the trial court for not considering the following actions:

> [T]he record is devoid of any attempt by the trial court to consider all reasonable alternatives to closing the proceeding. The trial court could have excluded only those persons who had made the derogatory statements or were disruptive. The court could have issued further admonishments[] or ma[d]e a contempt finding and lev[ied] a fine as punishment. If the court was concerned for the well-being of

[5]We recognize that the trial court's findings were filed after Rodriguez filed his brief. But Rodriguez was present during the trial when the trial court limited the exclusion to only those individuals who were disrupting the proceedings. Moreover, Rodriguez chose not to file a supplemental brief after the trial court filed its findings.

13

[Complainant], then the court could also have excluded those spectators during her future testimony[] or requested more bailiffs to attend the trial in order to ensure compliance. The record, however, is bereft of any such considerations. The court's order to exclude all of Appellant's friends and family was overly broad and [is] not supported by the record.

The alternatives that Rodriguez raises in his brief were either implemented by the trial court or were ones that the trial court could have sensibly rejected.

We will detail why Rodriguez's criticisms are invalid:

• The trial court took the limited actions that Rodriguez says that it should have taken—excluding only those who were disruptive;

• The trial court stated that it had admonished the disruptive individuals several times—without effect—and that "these less restrictive measures were not sufficient to stop them from distracting the jury." This demonstrates that the trial court had considered the possibility of whether additional admonitions would be effective and had concluded that they would not;

• The trial court considered and rejected the issuance of contempt findings, and we leave it to the trial judge to decide whether contempt would have produced compliance by those who were being disruptive and to balance the disruption that the contempt process would have created in the conduct of the trial against the more straightforward solution of excluding those who had refused to comply with the trial court's admonitions;

14

- The trial court had the discretion to decide if additional bailiffs were available and to balance the use of resources by placing more bailiffs in the courtroom and turning the courtroom into an armed camp against the impairment of the defendant's right to a public trial that came from excluding only those who had refused to follow the court's admonitions;

- The trial court was concerned not only that the spectators might disrupt Complainant's testimony but also that the persons disrupting the proceeding had actually threatened both Complainant and her mother, and Rodriguez offers no explanation for how excluding the persons making the threats during Complainant's testimony would have ameliorated the concern raised by the threats.

The findings demonstrate that the trial court considered and even implemented the alternatives raised by Rodriguez. And the standard of acting sensibly, though strict, should not be one that requires the trial court to anticipate and inventory every theoretical solution that a defendant might conceive on appeal and then justify the rejection of the solutions that were never put before the trial court. *See, e.g.*, *Bell v. Jarvis*, 236 F.3d 149, 169–70 (4th Cir. 2000) ("In this case, the closure under consideration extended only to the testimony of a single witness for her protection, and it would be utterly pointless to require the trial judge to conjure up alternative methods of protecting the witness only to reject his own proposals. Obviously, the trial judge is not in a superior position to suggest alternatives [that] may be more

15

acceptable to the defendant and his counsel."). The findings demonstrate that the trial court acted sensibly.

The trial court took a measured step to maintain control of the courtroom and the proceeding. *See* Tex. Code Jud. Conduct, Canon 3B(3). The findings documenting why the trial court took this action show both its justification and the trial court's careful consideration of the factors that must underlay the decision to partially close a trial.

### III. Issue No. 2—Rodriguez claims that the trial court permitted improper impeachment on a collateral matter.

Rodriguez testified that the allegations against him were revenge for Complainant's mother's belief that he had attempted to arrange a romantic liaison with an ex-girlfriend. In response to questions to him on direct, he denied that attempt. He persisted in his denial on cross-examination, though he admitted conduct that put him in a more negative light than he would have been in by admitting that he had planned the romantic liaison. A trial court should not usually permit impeachment on collateral matters, i.e., those that are not probative of guilt or innocence. *See generally Ramirez v. State*, 802 S.W.2d 674, 675 (Tex. Crim. App. 1990). But when a defendant lies gratuitously on a collateral matter, the defendant opens the door to impeachment. *See Cantu v. State*, 939 S.W.2d 627, 635 (Tex. Crim. App. 1997). Here, Rodriguez's lie was both volunteered and gratuitous; the trial court did not

16

abuse its discretion in permitting the State to impeach him with proof that he was lying.[6]

**A.  After Rodriguez volunteered a gratuitous lie that he did not try to arrange a romantic liaison with an ex-girlfriend, the trial court permitted the State to show texts that Rodriguez had sent to his ex-girlfriend that contradicted his testimony.**

Rodriguez chose to testify on his own behalf at trial.  A defensive theory relied on by Rodriguez was that Complainant was coached by her mother to make accusations against him in revenge because Complainant's mother was a woman scorned by Rodriguez's attentions to another woman.  He offered the incident as an explanation for why Complainant made allegations of abuse against him, saying that she was "trying to get [him] out of the picture" and that Complainant was mad because he was fighting with Complainant's mother.

Rodriguez's contact with his ex-girlfriend came to Complainant's mother's attention when she saw a text message on his phone with the ex-girlfriend; that resulted in a physical altercation when he would not let Complainant's mother see other messages that had been exchanged.  During direct examination by his counsel, Rodriguez portrayed himself as having rebuffed advances by his ex-girlfriend.  He reiterated that denial when asked about his ex-girlfriend on cross-examination.  And

---

[6]We test the trial court's decision to admit testimony under an abuse-of-discretion standard.  *See Sherman v. State*, No. 08-13-00105-CR, 2015 WL 1962815, at *3–4 (Tex. App.—El Paso Apr. 30, 2015, pet. ref'd) (not designated for publication) (testing trial court's decision to allow impeachment on collateral matter under an abuse-of-discretion standard).

when asked whether he had sent texts to his ex-girlfriend that had indicated he had tried to meet her, he denied the existence of such texts. Though Rodriguez eventually acknowledged that he had sex with another woman while involved with the Complainant's mother, he continued to deny that he had done so with his ex-girlfriend. None of the questions asked on cross-examination drew an objection from his counsel.

Though Rodriguez denied that he had planned a romantic liaison with his ex-girlfriend, he admitted on cross-examination that he had sent a nude picture of himself to other women while dating Complainant's mother. He freely admitted that he had accessed porn sites on his phone almost daily and, on many occasions, several times a day. He tried to turn this activity to his advantage, arguing that the porn sites on his phone demonstrated that he had not accessed child pornography. None of these questions drew an objection from his counsel.

Rodriguez's counsel's objection came when the State proffered witnesses who had examined Rodriguez's phone and could establish that he had planned to meet his ex-girlfriend and that the messages demonstrated the sexual nature of the rendezvous. The objections asserted that the testimony involved improper impeachment. The trial court overruled Rodriguez's objections and admitted the testimony.

During his closing argument, Rodriguez's counsel admitted that Rodriguez had lied. His counsel could not explain why Rodriguez did so. But as with Rodriguez's explanation of his porn viewing, his counsel tried to turn this conduct to his

18

advantage, arguing that Rodriguez might be a liar and an adulterer but that his conduct demonstrated that he was not a pedophile.

## B. Even if it involved a collateral matter, Rodriguez's act of volunteering a gratuitous lie opened the door for the State to offer proof, nailing the door shut on the lie.

Rodriguez argues that testimony showing what messages actually passed between him and his ex-girlfriend was improperly admitted. He argues that the Texas Court of Criminal Appeals's opinion in *Shipman v. State* prohibited this topic on cross-examination because it involved a collateral matter. 604 S.W.2d 182, 183–84 (Tex. Crim. App. [Panel Op.] 1980). *Shipman*'s rule prohibits impeachment on collateral matters to prevent distraction and time-wasting of trials within a trial on whether a matter that involves issues not relevant to the guilt or innocence of the accused is true or untrue. 1 Steven Goode et al., *Texas Practice Series: Guide to the Texas Rules of Evidence* § 607.3 (2019 ed.).

But the rule is subject to an exception when a party gratuitously opens the door on a collateral matter:

> [A] well-recognized exception to the rule barring impeachment on collateral matters exists when a witness testifies gratuitously as to some matter that is irrelevant or collateral to the proceeding. In that instance, the witness may be impeached by evidence contradicting her testimony showing she is in error as to that matter. *Rankin [v. State]*, 41 S.W.3d [335,] 343 n.17 [(Tex. App.—Fort Worth 2001, pet. ref'd)] (citing *Cantu*[, 939 S.W.2d at 635]; *Hammett v. State*, 713 S.W.2d 102, 105 (Tex. Crim. App. 1986)); *see Polk v. State*, 170 S.W.3d 661, 665 (Tex. App.—Fort Worth 2005, pet. ref'd) (same); *Altamirano v. State*, No. 08-01-00235-CR, 2003 WL 1889947, at *7 (Tex. App.—El Paso [Apr.] 17, 2003, no pet.) [(not designated for publication)] ("Under this exception to [r]ule 608(b),

19

a witness may be impeached by evidence contradicting her gratuitous and voluntary testimony on an irrelevant or collateral matter."); *see also Cantu*, 939 S.W.2d at 635 (holding that the rule permitting cross-examination on any matter relevant to credibility, allows for impeachment on a collateral matter when relevant to a witness's credibility by contradicting witness's testimony); Tex. R. Evid. 613(b). The [Texas] Court of Criminal Appeals has instructed in this regard that: "Should the witness or the party tendering him 'open the door,' however, by gratuitously raising the collateral matter, the opposing party may impeach the witness on the matter so raised." *Hammett*, 713 S.W.2d at 106 n.4.

*Sherman*, 2015 WL 1962815, at *4.[7]

Rodriguez's misrepresentations about his planned liaison with his ex-girlfriend were not directly probative of guilt and thus were collateral. But Rodriguez opened the door by volunteering untruthful information, and the State simply accepted his invitation to demonstrate the statement's untruth. The back and forth began when Rodriguez misrepresented the nature of his contacts with his ex-girlfriend. He made this representation even though his counsel had already described the incident in his opening statement as one involving infidelity. Rodriguez held to his lie even though he had admitted to conduct that was as, if not more, salacious than trying to arrange a romantic liaison with his ex-girlfriend. The best indication of the gratuitous nature of

---

[7]Federal courts describe the opening-the-door theory as the "specific[-] contradiction doctrine." *See Montoya v. Shelden*, 898 F. Supp. 2d 1279, 1293 (D.N.M. 2012) ("The rule precluding the 'admission of extrinsic evidence of specific instances of conduct of the witness when offered for the purpose of attacking credibility . . . does not apply, however, when extrinsic evidence is used to show that a statement made by a defendant on direct examination is false, even if the statement is about a collateral issue.'" (quoting *United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir. 1994))).

the lie was his counsel's admission during closing argument that he was unable to explain why Rodriguez would lie about this contact. Whatever the reason for his inept attempt at deception, its commission was both voluntary and gratuitous. His persistence in the unneeded lie put his credibility in issue, and the trial court did not abuse its discretion by allowing the State to put truth to the lie that Rodriguez had not attempted to arrange a romantic liaison with his ex-girlfriend.

## IV. Conclusion

We overrule Rodriguez's two issues and affirm the judgment of the trial court.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: June 13, 2019

Trial Court No. F16-930-362
Appellate Court No. 02-18-00339-CR

STATE OF TEXAS          §      IN THE 362nd JUDICIAL

VS.                       §      DISTRICT COURT

HENRY ACUNA RODRIGUEZ     §      DENTON COUNTY, TEXAS

AT 2:06 O'CLOCK P M
FILED
JAN 3 1 2019
DISTRICT CLERK
Denton County, Texas
BY:
DEPUTY

## AMENDED COURT'S FINDINGS OF FACT

On January 16, 2019, the Court of Appeals issued an Abatement Order instructing this court to reduce to writing specific fact findings to support the decision to exclude friends and family of the defendant. As instructed, those findings are set forth below:

### Findings of Fact

1. The Court conducted a four-day jury trial of the Defendant, Henry Acuna Rodriguez, on July 23-26, 2018. Present during the jury trial were the defendant, the defendant's attorneys, Bruce Isaacks and Camila Francino, and assistant district attorneys Rick Daniel and Dustin Gossage. Present in the gallery were the victim, her mother, an unidentified friend of the victim, a member of the Victims Assistance division of the District Attorneys office, and D.A. investigator Greg Sterns. Additionally, throughout the trial, the defendant had six to eight friends or members of his family in the courtroom, including his mother. The exact number is unknown.

2. On Tuesday, July 24th, B███ C███ was seated in the gallery with other friends or family members of the defendant. While the jury was listening to the evidence, Ms. C███ was making exaggerated facial expressions, shaking her head, emitting loud sighs all demonstrating her obvious displeasure with the testimony. These actions were distracting both the jury and the court. Therefore, my bailiff admonished Ms. C███ that she would need to stop these actions or she would have to leave. My bailiff also asked Mr. Isaacks to tell the defendant's friends and family members to act appropriately while in the courtroom. Mr. Isaacks instructed the defendant's friends and family to behave appropriately or they would have to leave the courtroom.

3. On Wednesday, July 25th, B███ C███ was seated in the gallery with other friends or family members of the defendant. While the jury was listening to the evidence, Ms. C███ continued her facial expressions, shaking her head,

6

22

emitting loud sighs, etc. Once again, these actions were distracting both the jury and the court. At one point during the testimony, Ms. C███████ became so upset that she loudly stormed out of the courtroom disrupting the trial. She later returned to the courtroom. Since my bailiff's warnings and Mr. Isaacks' admonishments did not change her behavior, I found it necessary to address her. At the next recess, outside the presence of the jury, I told Ms. C███████ that her behavior was distracting the jury and the court. I warned her that if her actions continued, that she would not be allowed back in the courtroom. She stated she understood and that she would just remain outside of the courtroom. I let her know she could remain in the courtroom as long as she behaved appropriately. (The official Reporter's Record of this exchange is included as Exhibit No. 1 of these findings.) This exchange occurred in open court with all the parties, counsel, and the defendant's family and friends present.

4.   On Thursday, July 26th, the jury found the defendant guilty of Continuous Sexual Assault of Young Child. The defendant elected to have the court assess punishment, therefore, the jury was excused. The court then took a recess. The victim and her mother remained on one side of the courtroom while the defendant's friends and family remained on the other side of the courtroom. A few members of the defendant's friends and family turned and made threats and derogatory statements to the victim and her mother. My bailiff immediately walked between the two groups to keep them separated. He then instructed the two to four people that were making the threats and derogatory statements that they had to leave the courtroom. At least three or four friends and family of the defendant, including the defendant's mother, remained in the courtroom for the remainder of the trial.

5.   When the trial continued, the court gave a summary of what occurred off the record. (The official Reporter's Record of this exchange is included as Exhibit No. 2 of these findings.) The court stated "So the individuals that were making the disruption and making the derogatory comments to the child victim in this case are excluded from the courtroom..." Defendant's counsel requested a clarification of which members of the defendant's family and friends were excluded. The court clarified that members of the defendant's family and friends that were still in the courtroom were allowed to remain in the courtroom by stating "So all the ones that are currently outside the courtroom now are the ones that were excluded from the courtroom. The others are welcome to remain in the courtroom."

6.   The courtroom and proceedings were never closed to the public. The only people that were excluded from the courtroom were the two to four individuals that were causing the disruption by making threats and derogatory comments to the victim and her mother. All other members of the public previously listed, including the defendant's mother and other family and friends remained in the courtroom.

7.   The exclusion was necessary to conduct fair trial for the defendant wherein the jury could concentrate on the evidence presented. Throughout the trial, several

7

23

jurors had complained that the behavior of certain members of the defendant's family and friends were distracting them from the testimony. Additionally, the exclusion was necessary to protect the child victim and her family from threats and derogatory comments. The bailiff had to step in to and remove the two to four people that continued making threats and derogatory comments. Finally, the exclusion was necessary to maintain order for a criminal jury trial.

8.   The court had previously used less restrictive means by admonishing these individuals several times about their inappropriate behavior. Unfortunately, these less restrictive measures were not sufficient to stop them from distracting the jury and disrupting the proceedings. Therefore, excluding only these specific individuals from the courtroom was necessary and the least restrictive means to proceed with an orderly trial.

Signed this the 31st day of January, 2019.

Judge Bruce McFarling,
362nd District Court

8

24

Exhibit #1                1

REPORTER'S RECORD

VOLUME 4 OF 6

TRIAL COURT CAUSE NO. F16-930-362

COURT OF APPEALS NO. 02-18-00339-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | DENTON COUNTY, TEXAS |
| | § | |
| HENRY ACUNA RODRIGUEZ | § | 362ND JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRIAL ON THE MERITS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 25th day of July, 2018, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Bruce McFarling, Judge Presiding, held in Denton, Denton County, Texas.

Proceedings reported by machine shorthand using computer-aided realtime translation.

Why don't y'all be back in the jury room at 10 after 3:00, please.

THE BAILIFF: All rise for the jury.

(Open court, defendant present, no jury)

THE COURT: You may be seated. We'll be in recess.

(Recess)

(Open court, defendant present, no jury)

THE COURT: We'll go back on the record. We are outside the presence of the jury.

Ma'am, would you please state your name?

MS. ██████ B██████ C██████.

THE COURT: What's the last name?

MS. ██████ C██████.

THE COURT: Ma'am, can you spell that for me, please.

MS. ██████ C-██████.

THE COURT: During the trial sometime yesterday and also during today, your actions of facial expressions, huffing and puffing and storming out during the testimony has been distracting in front of the jury and to the court. So at this

point in time I'm going to warn you that if those actions continue that you will not be allowed to be back in the courtroom. Do you understand that?

MS. C███████ Yes, your Honor.

THE COURT: All right. So just make sure -- you're allowed in the courtroom, but there's no facial expressions, nothing to disrespect any party or the jury. And make sure that you keep quiet. And if you leave, don't make it so that it's apparent to everybody that you're leaving. You need to get up --

MS. C███████ Well, I'll just stay outside of the court.

THE COURT: Well, I'm just letting you know if you want to be in the courtroom, you can, but just make sure that you apply those standards that I've discussed with you. Okay?

MS. C███████ Yes, your Honor.

THE COURT: We'll be in recess.

(Recess)

(Open court, defendant and jury present)

THE COURT: You may be seated. You may continue.

Q. (BY MR. DANIEL) Mr. Rodriguez, we left off

27

REPORTER'S RECORD

VOLUME 5 OF 6

TRIAL COURT CAUSE NO. F16-930-362

COURT OF APPEALS NO. 02-18-00339-CR

THE STATE OF TEXAS      §   IN THE DISTRICT COURT
§
VS.      §   DENTON COUNTY, TEXAS
§
HENRY ACUNA RODRIGUEZ      §   362ND JUDICIAL DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRIAL ON THE MERITS

PUNISHMENT PHASE

SENTENCING

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 26th day of July, 2018, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Bruce McFarling, Judge Presiding, held in Denton, Denton County, Texas.

Proceedings reported by machine shorthand using computer-aided realtime translation.

12

here at 2:00, please.

(Recess)

PUNISHMENT PHASE BEFORE THE COURT

(Open court, defendant present, no jury)

THE COURT: We'll go back on the record. The jury has been excused.

After the jury was excused and the court took a recess, in the courtroom various members of the gallery then became disruptive and were saying derogatory things to the victim and the victim's family in this case. Those individuals were then told that they're not allowed back in the courtroom. I've already made various warnings and admonishments about proper courtroom decorum. So the individuals that were making the disruption and making the derogatory comments to the child victim in this case are excluded from the courtroom for the remainder of the hearing unless they're a witness. If any of them are witnesses, then they will be allowed to testify.

So, Mr. Isaacks.

MR. ISAACKS: Just for clarification, your Honor, which of the friends and family members of the defendant specifically are we excluding?

Because I was kind of watching what was going on up here, so I didn't see anything behind me.

THE COURT: It was the individuals -- are there any individuals out there, Mr. Hartwell, that are not being excluded?

THE BAILIFF: No, sir.

THE COURT: All right. So all the ones that are currently outside the courtroom now are the ones that were excluded from the courtroom. The others are welcome to remain in the courtroom.

Yes.

MR. ISAACKS: Your Honor, my client, Henry Rodriguez, is entitled to have a public and speedy trial. By the court excluding members of his family and friends of his, I believe that the court is denying the defendant and violating his statutory and constitutional right in both the State of Texas rules and statutes and constitution, as well as the United States Constitution and amendments.

THE COURT: Well, any objection at this point is overruled. It's very rare that I exclude anyone from the courtroom, but the other option is to have them being held in contempt and put them in jail, in which, once again, they would not be in the courtroom anyway. So at this time

14

30

that -- any objections are overruled.

MR. ISAACKS: Thank you for considering my objection.

THE COURT: Is the state ready to proceed?

MR. DANIEL: Yes, your Honor.

THE COURT: Mr. Isaacks, are you ready to proceed?

MR. ISAACKS: Yes, your Honor.

THE COURT: You may proceed, Mr. Daniel.

MR. DANIEL: The state would waive opening statement, your Honor.

THE COURT: You may proceed.

MR. GOSSAGE: The state calls Mario Merendon.

THE COURT: Please have a seat, sir. You are still under oath.

MARIO MERENDON,
having been previously duly sworn, testified as follows:

DIRECT EXAMINATION

Q. (BY MR. GOSSAGE) Investigator Merendon, have you previously testified in this trial?

A. Yes, sir, I have.

when you leave I need you to be on your best behavior. Okay?

A. Uh-huh.

Q. Elizabeth, thank you very much for making the trip down here from Las Cruces, and thanks for answering my questions. And I would ask you to give Mr. Daniel or Mr. Gossage the same respect that you've shown to the court.

A. Yes, sir.

MR. ISAACKS: I'll pass the witness, your Honor.

MR. DANIEL: No questions, your Honor.

THE COURT: You may step down, ma'am.

MR. ISAACKS: Could I have just one minute? It will be less than a minute.

THE COURT: Yes, sir. Mr. Isaacks, we're probably going to take a break, so that way you can talk to him there. And that way I'll address my 3:30 cases.

MR. ISAACKS: Yes, sir.

THE COURT: We'll be in recess at this time.

(Recess)

(Open court, defendant present, no jury)

THE COURT: We'll go back on the record.

Mr. Isaacks.

MR. ISAACKS: Your Honor, I would like to put a little matter with my client on the record, and then I'll be prepared to rest in punishment.

THE COURT: Very good. All right. Just to make sure that you know that even people that are outside, you're still allowed to call whichever witnesses you want to, whether they've been excluded or not. Do you understand that?

MR. ISAACKS: Thank you, your Honor. I've called the witnesses that I believe are needed to testify on behalf of my client.

THE COURT: Excellent. All right.

And so you're under oath, sir.

HENRY ACUNA RODRIGUEZ, having been previously duly sworn, testified as follows:

DIRECT EXAMINATION

Q. (BY MR. ISAACKS) You're the same Henry Rodriguez that was sworn in to testify during the guilt/innocence portion of the trial. Correct?

A. Yes.

Q. And you realize you're under oath still,

17

33